Heard April Term, 1878.

CASE No. 650.

HENRY KOON, AS ADMINISTRATOR *DE BONIS NON* OF CLINTON WILSON, v. WILLIAM MUNRO, AS ADMINISTRATOR OF W. J. KEENAN, AND THE DISTRIBUTEES OF WILSON'S ESTATE.

1. An administrator during the war was justified in receiving confederate money at its nominal value, on *ante-bellum* contracts, when such money was needed to defray current or extraordinary expenses of the administration, *or* to pay outstanding debts, whose payment was capable of being enforced, *or* where there was danger of losing an unsecured credit if not collected, *or* for purposes of payment to a legatee or distributee with his or her sanction. But an administrator should not be held to strict account-

ability as an insurer of such reasonably anticipated results, if actuated by a fair and honest judgment, resting on reasonable grounds. Our cases since 1868 upon this subject reviewed.

2. If an administrator in 1864 funded confederate money, rightfully in his hands and not available for purposes of the administration, into confederate bonds, he would be entitled to a credit on his accounts for the bonds.

3. An administrator may discharge in a depreciated currency only so much of his own indebtedness to his intestate, as may be advantageously used for the benefit of the estate.

4. At whatever time of the year letters of administration are granted, the administrator is chargeable with interest on the balance in his hands at the end of that calendar year.

5. Commissions to an administrator are compensation for services rendered, and their forfeiture, for failure to make annual returns, may be enforced as incidental to an accounting.

6. The duty of filing annual returns is imposed upon an administrator by an act of the legislature, and must be enforced according to the terms of the statute.

7. Where a debtor to an intestate administers on his estate, and charges himself as administrator at different dates afterwards, with collections of his own indebtedness, persons interested in the estate may hold the administrator to such statement of his actual payments, or may rely upon the principle that his debt was paid the day he administered.

8. An administrator having confederate money in his hands in April, 1864, will not be credited with one-third part thereof, because the value of such money was reduced to that extent by an act of the Confederate States congress.

9. A judgment filed more than sixty days after the last day of the term at which the cause was heard, is valid. *Constitution, Article IV.,* § 17.

---

Before NORTHROP, J., at Union, March Term, 1877.

This was a case in chancery brought by the plaintiff as administrator *de bonis non* of Clinton Wilson, deceased, against William Munro, as administrator of William J. Keenan, deceased, who during his lifetime had been administrator of the said estate of Clinton Wilson, and against the distributees of the said Wilson, praying an account by said William Munro of his intestate's administration of said Wilson's estate, and for a sale of the lands of said Wilson in aid of assets. The distributees, in their answer, join in the prayer of complainant that William Munro, as the legal representative of the said William J. Keenan, do exhibit a full and particular account of his intestate's administration up to the time of his death of the estate of Clinton Wilson, that came into

the hands of the said William J. Keenan to be administered. The defendant, as administrator as aforesaid, filed his answer, and therewith submitted an account of his intestate's administration of the said Wilson's estate, claiming " that the estate of Clinton Wilson is indebted to the estate of Wm. J. Keenan, in the sum of $291.96 on September 16th, 1867 ; and also in the sum of $650.87 in Confederate States money."

By order of the court, dated March 24th, 1873, it was referred to John L. Young, Esq., as special referee, " to take the testimony in the above-stated case, and to state the account of W. J. Keenan as administrator of the estate of C. Wilson, deceased."

The referee submitted his report on September 10th, A. D. 1873.

To this report exceptions were taken by the administrator of Keenan, and also by the distributees of Clinton Wilson's estate.

The following facts were brought out by the testimony and the accounting: Clinton Wilson died November 23d, 1860, and letters of administration on his estate were granted to William J. Keenan, December 14th, 1860. The estate consisted principally of choses in action to a very considerable amount, nearly all of which were collected in Confederate States currency; among these were a note of said W. J. Keenan for $2000, less a credit, besides interest, and a note of Keenan & Norris (a firm, of which Keenan was a member,) for $9712.83, besides interest. On December 31st, 1860, Keenan, administrator, had received for the estate $2056.65, in excess of his receipts. On his own indebtedness and the indebtedness of Keenan & Norris, he charged himself, in his first return, filed April 2d, 1862, with $5125, paid by Keenan & Norris, January 21st, 1861; in his second return, filed March 11th, 1863, with $2500, paid by Keenan & Norris, July 1st, 1862; in his third return, filed January 10th, 1866, with $7047.37, balance, paid by Keenan & Norris, February 22d, 1863, and with $2298.32, balance, paid by W. J. Keenan, February 22d, 1863. Keenan collected large amounts from other parties during those years and paid out large sums to creditors. In 1864 and 1865 he made no returns; his transactions for those years were embraced in his return of January, 1866.

---
Decree.
---

Of the moneys in his hands, $5800 were invested in Confederate States bonds.

Some of the collections made by Keenan were shown to have been from parties insolvent at the close of the war, and some from parties insolvent at the time they made their payments, and also insolvent at the close of the war.

Keenan died November 17th, 1867, in New Orleans; William Munro administered on his estate in South Carolina. Letters of administration *de bonis non* on the estate of Clinton Wilson were granted to Henry Koon, the plaintiff, March 6th, 1869.

The case came on for a hearing before Northrop, J., at March Term, 1877, and on October 1st, 1877, his decree was filed, which was as follows:

This cause is one of complicated accounts in the settlement of an estate. It was heard on exceptions to report of referee. The testimony shows that Clinton Wilson died A. D. 1860. Keenan administered December 14th, 1860, and died November 17th, 1867. Henry Koon, on March 6th, 1869, took out letters of administration *de bonis non* upon the Wilson estate, and William Munro, defendant herein, became administrator of the personal estate of Keenan, deceased. Henry Koon filed his bill in this court March 11th, 1869, praying for a full and particular account of the administration of his intestate's estate, and making the heirs-at-law of Clinton Wilson, deceased, parties defendant. Their answer was filed November 29th, 1870.

John L. Young, referee, made his report September 10th, 1873. In the meanwhile, the defendants E. P. Coulter, W. Harrison Gregory and his wife, and Austin Wilson died, and Charles Bolt, clerk, administered upon their estates and has filed his answer herein.

The referee reports $8745.55 as due by William J. Keenan, administrator, in "Confederate currency" on September 19th, 1867, and $304.61 due to him on same date in "United States currency."

Plaintiff and defendant excepted. The second exception taken by defendant's counsel; that the referee should have allowed W. J. Keenan, administrator of Clinton Wilson, deceased, credit

for the sum of $428.50, interest from January 21st, 1861, to April 1st, 1862, according to vouchers Nos. 27, 28, and 29, is sustained.

The real issue raised by the pleadings in this cause, appears in the plaintiff's exception, objecting to the finding of the referee : that the balance due the estate of Clinton Wilson, was due in "Confederate currency," and not in legal or United States currency, as well as in the defendant's exception, objecting to the finding of the referee, refusing the administrator of Clinton Wilson credit for $3500, invested in seven per cent. confederate bonds. It seems to be admitted for the purposes of this decree that the investment was made on December 31st, 1864. Was this investment just and legal, and is the balance found against the defendant to be struck in confederate currency, or in lawful currency ?

The testimony was voluminous, and the argument on either side eminently laborious and accomplished.

I am clearly of opinion that the investment was not proper, nor can it be allowed, and that the balance against the administrator should be found in legal currency. It seems plain from the testimony that the assets were *ante bellum,* and that their origin was of a gold valuation. The administrator was largely indebted to his intestate's estate, and I am not satisfied that he was authorized to receive in confederate currency any further payments than were necessary to the purposes of the administration, and surely not more than were actually paid out by him in discharge of the liabilities of his intestate's estate. He was able to pay the same, $17,000 of his own debt, contracted at a gold valuation, by paying out confederate currency, and cannot take refuge behind the general reputation for patriotism to which he was entitled. It is good law, that debts due an estate by the administrator are as cash in his hands, but it appears here that the administrator charged himself from time to time with the collection of these assets, subsequent to the administration, and that he was one of a co-partnership indebted to the estate.

There was much effort to show by letters and other testimony that the defendants, Elkanah Coulter and John Coulter, bound their wives as distributees, to the ratification of this investment.

If this was proved, it could hardly bind the other' distributees to their loss.

Nor am I satisfied that these defendants could bind their wives—the distribution not having been completed before the death of the wives. There would have been no settlement, nor reduction into possession. But as matter of law, I find the proof insufficient. *Story on Agency,* § 237, *and note.* They, the Coulters, do not appear to have had knowledge of the essential facts.

This investment appears to me, therefore, to have authority neither in fact nor law.

If it could appear that the administrator had received, as a matter of necessity, the confederate currency invested in confederate bonds, I would not hesitate to hold the investment legal and valid. *Fitzsimmons* v. *Fitzsimmons,* 1 *Rich.* (*N. S.*) 413; *Home* v. *Lockhart,* 17 *Wall.* 576; *Cureton* v. *Watson,* 3 *Rich.* (*N. S.*) 454.

The facts, however, as I understand them, do not warrant this view of the case, and I am constrained to conclude that this investment was without authority of law. So far as interest is concerned, I have reached the conclusion that interest should be charged on the balance struck on January 1st of each year; that no interest should be allowed on the balance due by the administrator, Keenan, from time of his death, until letters of administration were granted *de bonis non*—that is, from November 17th, 1867, to March 6th, 1869.

Counsel have agreed to allow the commissions to the administrator on the balance found due by him, and they are allowed.

I file with this decree a statement of the administrator's account as it appears to be made out.

It is therefore ordered, judged, and decreed that the plaintiff, Henry Koon, administrator *de bonis non* of the estate of Clinton Wilson, recover of Wm. Munro as administrator of the estate of Wm. J. Keenan, deceased, the sum of $11,122.61, to be paid by the said Wm. Munro, out of any assets in his hands belonging to the estate of his intestate not yet administered, and any that may hereafter come into his hands to be administered, and that the said Henry Koon do, after paying all the costs of this suit,

and expenses of administration, pay over the balance in his hands to the distributees of the estate of Clinton Wilson, deceased, their attorneys or assignees, according to their respective interests.

And it is further ordered that the said distributees, and Henry Koon, as administrator *de bonis non*, have leave to apply at the foot of this decree for such orders as may be necessary to carry out such decree.

In the statement of the administrator's accounts, filed with the Circuit decree, the administrator is charged with interest on balance in his hands December 31st, 1860, and is allowed no commissions on his receipts and disbursements for 1863 and 1864. William Munro, administrator, appealed to this court upon the following grounds:

1. Because, from the proof, the collections made by the administrator in confederate money, were rendered necessary by the exigencies of the estate, were proper under the circumstances attending them, and should therefore be sustained.

2. Because the administrator should have been allowed credit for the amounts collected on the notes of Keenan & Norris and of W. J. Keenan, that were actually expended in paying off debts of the intestate, contracted in legal currency.

3. Because the administrator should not have been charged in legal currency with amounts collected by him in confederate currency from insolvent persons, who could not have otherwise paid their debts due to the intestate, or any part thereof.

4. Because, even if charged with amounts collected by him in confederate money on debts outstanding at the intestate's death, and unsecured, due by insolvent or doubtful persons, he should only be charged with the actual value of the money so collected by him, and not with the whole amount in legal currency.

5. Because the administrator is charged with interest on $2056.65 for one year, from December 31st, 1860, to December 31st, 1861, when administration was granted on December 10th, 1860.

6. Because the administrator is not allowed commissions upon the amounts due from W. J. Keenan and Keenan & Norris, col-

K

lected during his administration; nor upon amounts paid to the same parties.

7. Because the administrator is not allowed commissions upon his receipts and expenditures during the years 1863 and 1864, but is charged with the amount thereof as legal currency.

8. Because, if the collections from Keenan & Norris and Keenan are not sustained, interest should be calculated upon their notes, and not upon annual balances against the administrator.

9. Because the conclusion of fact reached by his Honor the Circuit judge, that the investment of the administrator in confederate bonds was made on December 31st, 1864, was not admitted by the defendant, and is not sustained by the proof.

10. Because the investment made by the administrator in confederate bonds ought to have been sustained.

11. Because, if not sustained as to all the distributees, it should have been as to the wives of John Coulter and Elkanah Coulter, and especially as to the interest of John and Elkanah Coulter, purchased by them from         Wilson, one of the distributees of Clinton Wilson, deceased.

12. Because, if the investment in confederate bonds is not sustained, then the amount of confederate money in the hands of the administrator, on April, 1864, should have been reduced one-third, as provided by act of congress of Confederate States.

13. Because the decree of his Honor the Circuit judge was not filed within sixty days from the last day of the term of court at which the cause was heard, as required by Article IV., Section 17, of the constitution of this state.

*Messrs. J. B. Steedman* and *R. W. Shand,* attorneys for appellant.

*Messrs. Rion & McKissick,* attorneys for respondent.

November 22d, 1878. The opinion of the court was delivered by

WILLARD, C. J.   W. J. Keenan administered on the estate of C. Wilson. At Keenan's death, administration *de bonis non*

was granted to the plaintiff, Koon, and the defendant, Munro, became the administrator of Keenan.

The administrator of Keenan is now called to account for the administration by his intestate of the estate of C. Wilson.

The principal question in the case is whether the estate of Keenan should be allowed certain credits claimed as due from the fact that he had converted assets of the estate into confederate bonds in 1864. It must be assumed that this transaction was, in point of fact, the funding of confederate currency in bonds of a like character, though bearing interest. It appears in evidence, and is also notorious as part of the general history of those times, that at the time of such funding (1864) confederate currency was the only currency in circulation in this state. It is not alleged nor suggested that any other currency was in the hands of the administrator at the time of such funding; on the contrary, the scope of the argument in the case embraces the inference that the collections for the estate were made in confederate currency, so far, at least, as the character of those collections could enter into the present question.

Should it appear that at the time of such funding the administrator had rightly become possessed of, and held as part of the assets of the estate, an amount of confederate currency in excess of what was capable of being disbursed for the legitimate purposes of the administration, and that in 1864 he had funded that amount in confederate bonds, he would be entitled to account for the confederate currency by credit for the bonds taken in exchange for it. Such a transaction would amount to no more than the conversion of a non-interest-bearing security of a certain class into an interest-bearing security of the same class, and, as such, could manifestly occasion no loss of assets. The important question in this case is whether the administrator can be regarded as having converted confederate currency, rightfully in his hands, as assets of his intestate, into confederate bonds. It is possible that the administrator might, consistently with a due discharge of his official duty, have become possessed of assets of the estate in the form of confederate currency, notwithstanding the fact that such currency was not, in a legal sense, money, so that the debtors of the estate could compel its reception in discharge of

their debts, and notwithstanding the further fact that its current value was less than its nominal value as compared with gold, and that it should be taken at its nominal value in the discharge of debts due the estate.

The object of administration is the distribution of the decedent's estate among those entitled to it according to law. Debts must be collected and paid as the first step towards distribution. That it may happen that a community is stripped of the due and legal medium of discharging obligations, namely, coined money or its legal equivalent, is a possibility not so remote but that it may be considered by the courts. Such a state of things existed in this state during the period covered by the administration of Keenan. Although the circumstances that accompanied such condition of things were peculiar, yet, even if we could conclude that their exact recurrence in any community could not be regarded as a reasonable possibility, the fact remains that the real cause of the monetary condition was the absence of gold and silver from the state to such an extent as to deprive the community of a proper medium of exchange. This fact was not necessarily dependent on the circumstance that there was pending a dispute as to the right of supreme governmental authority over the territory of the state, maintained by arms, and involving incidentally the question of what was to be regarded as lawful money for the purposes of discharging obligations. Coined gold and silver, of a suitable character to obviate all question as to the proper medium of payment, might have existed in sufficient quantities to meet all demands upon a currency, notwithstanding the pendency of such a question. Other causes than that of the nature of the political questions involved induced the disappearance of gold and silver. Commercial causes afford the real means of explaining this fact. The pendency of the war at once created a demand for purchases abroad, and prevented exportations of a class of commodities that would have supplied the place of gold and silver in such transactions.

Gold and silver disappeared from the state as the medium of exchange. This was not a peculiar consequence of a war of an exceptional character, but a natural and ordinary consequence of war dependent only on the fact that one of the belligerents pos-

sessed the means of excluding the others from ordinary exchanges in foreign markets, to which the other was compelled to have recourse as a purchaser. The disputed question of sovereignty had no necessary connection with its occurrence. We must therefore conclude that the possibility of the deprivation of a community of the proper medium of the payment of obligations is within legal contemplation and consideration, and we are at liberty to look for the rules that should prevail under such a state of circumstances.

Although when such a state of things exists, it must be regarded as temporary as affecting the general functions of the state, yet it is not in such a sense temporary that administration and similar legal functions can be suspended during its continuance. To maintain a state of war without exhaustion, or to overcome any other natural cause tending to paralyze public economy and private industry, must be the care of every government, and a reasonable view of the objects of laws must lead to the conclusion that there are principles intended to meet such exceptional cases, intimately connected as they must be with the general well-being of the community. To interrupt the due course of law as to the transmission of property or solution of debts, is to diminish the general prosperity to the degree that such interruption is important as it regards the extent of the transactions affected, or its duration. In view of these circumstances, it is impossible to conclude that when, from the pendency of war or other cause, the community is deprived of the customary and legal means of paying debts and making exchanges, and resort is had by common consent to a substantial currency without definite legal authorization, the course of administration must cease, and administrators retain the assets in their hands unconverted and unapplied to the purposes of administration, whatever might be its consequences as affecting the administration. Such a rigid rule would work peculiar hardship in the case of administrations.

Death seldom finds estates in such complete preparation that outstanding credits are equivalent to investments and debts without power of compelling the disposition of assets. On the contrary, it must be anticipated that the assets of an intestate estate

will embrace credits of an unsecured and doubtful character, and debts capable of creating a pressing necessity for calling in the credits of the estate. It must be assumed as a general fact that there is a necessity for prompt action on the part of administrators that cannot admit of suspension or interruption under such a state of public affairs as that under consideration. If debts are not paid, the sale of assets can be compelled, and from the necessity of the case supposed the assets must be sold for the prevailing currency, such as it is, and that currency must be the means of paying the debt. To require that property be sold at public sale, for gold and silver, when those commodities cannot be obtained, would be oppression under the forms of law and contrary to justice. If the administrator, unwilling to take collections of credits in such cases in such currency, permits the realized property of the estate to be seized and applied to the payment of its debts, then, while the sacrifice is only transferred from the doubtful assets to the good, not only the natural order of looking in the first instance to the outstanding credits as the means of paying debts is disregarded, but the collection of uncertain and doubtful demands postponed at the very time when it should be specially pressed, for the existence of such a state of affairs necessarily depreciates all obligations resting merely on personal responsibility.

It cannot be doubted that when an entire community, without dissent, and under the spur of necessity, concur in adopting a medium of exchange that can only derive its value from common consent, and the language of commerce and trade, and, indeed, of all industry, becomes accommodated to such medium of exchange, power to employ such medium in transactions would be implied from such general consent, in many supposable cases, which would bind parties in the absence of their declarations to the contrary. It would be difficult to define this principle with accuracy, and establish its conditions and limits; but its existence cannot be doubted. The existence of such a presumption as existed between the attorney who issued an execution during the period under consideration, and the sheriff who sold property for confederate money under such execution, is illustrated in *State* v. *Moseby*, 10 *S. C.* 1. The present ques-

tion does not directly depend on the operation of such an implied power, but the principles are closely allied.

It would follow, if the foregoing deductions are sound, that the test of the right of the administrator to receive, in satisfaction of the debts of the estate, a currency in common use but not having the quality of a legal tender, is the necessity of the administration ; one element of this necessity being the existence of debts capable of affecting, prejudicially, the assets of the estate unless satisfied, and the other would be just ground to apprehend loss of assets by allowing unsecured debts to remain outstanding. As it regards the payment of legacies and distributive shares, it is evident that either the express consent of persons entitled thereto, or such facts and circumstances as would give rise to a presumption of such consent, would warrant the reception of such currency when only required for purposes of that description. It is clear that in either of these cases, as well as when money is needed to defray current or extraordinary expenses of the administration, the administrator would be authorized to receive such currency at the rate at which it passed from hand to hand in the community as money, unless there should be reason to conclude that it could not be advantageously employed at such valuation for the purposes of the administration. In the cases supposed it might wholly defeat the end proposed, for the administrator to insist that currency should be used in such transactions at its value, according to a gold standard. It is unlikely that parties who might use their currency more advantageously, would employ it for the purpose of paying debts. Besides, the case supposed rests on the reasonable idea that such currency may be used at its nominal value for the legitimate purposes of administration, and in that case the value of the currency would be that for which it would be advantageously used in the purposes of the administration, and not what it is worth, according to a legal standard, practically inapplicable to the case.

It is proper to add that, in applying these principles, the administrator ought not to be held to strict accountability as an insurer of such reasonably anticipated results, but so long as he brings a fair and honest judgment, resting on reasonable grounds, to guide his conduct in this respect, he should receive protection.

This depends on the principle that one clothed with the exercise of discretion is only responsible for its abuse.

There is nothing in the cases heretofore decided by this court on this general subject that conflicts with the foregoing propositions, but much to sanction them. *Clark* v. *Deveraux,* 1 *S. C.* 172. The point decided in this case was that a trustee could not make a profit to himself out of the trust estate by retaining assets of the estate and accounting for them in depreciated currency at its nominal value. Here there was no question on the ground that advantage to the estate was contemplated, but the interest of the trustee was alone the ground of his action. *Gibbes* v. *Guignard,* 1 *S. C.* 359, involved a question of fact merely. The legal question of the right of a trustee to invest in confederate securities did not arise for decision, the fact of such investment not being established. *Mayer* v. *Mordecai,* 1 *S. C.* 383. In this case, bonds adequately secured and constituting a settled fund, were unnecessarily called in and invested in confederate securities. The case turned upon the necessity, under the deed of trust, of consultation with the *cestuis que trust* in the case of a change of investment. It was held that there was an impropriety in calling in the settled investment and taking in payment currency at a less actual value than the bonds called for, although at its nominal value, but the force of this consideration was in the fact that there was no necessity, actual or presumable, that warranted such action on the part of the trustee, and the absence of such a necessity was pointed out as material in the opinion in the case.

*Sanders* v. *Rogers,* 1 *S. C.* 452. In this case the trustee called in a secured bond in confederate currency at its nominal value, as he alleged, with the expectation of purchasing other bonds, as directed by the terms of the trust. It was held that the trustee had no reasonable ground for calling in such bond, as no arrangements had been made at the time of calling it in for such a purchase; in fact, no substantial purpose of re-investing appeared, but the confederate currency was suffered to lie unproductive for a long time, and finally was converted into confederate bonds. The loss for which the trustee was held liable was not for converting the currency into bonds, but for taking it in payment of a secured bond without any necessity therefor.

*Womack* v. *Austin*, 1 *S. C.* 421. The investments in this case were required to be of certain specified kinds, excluding an investment in confederate bonds. Confederate bonds are stated in the views of the court to have been unsafe means of investment. . This does not apply to the conversion of a still less valuable security, as not bearing interest, into such bonds, and by no means conflicts with the proposition under consideration, which only contemplates the use of confederate currency for a temporary purpose, as a medium of exchange, but in harmony with a view that looks only to necessity, as connected with the interests of the estate, as the ground for receiving such currency.

*Moorehead* v. *Orr*, 1 *S. C.* 304. The point decided in this case was that the administrator of a guardian has no right to exercise the powers of his intestate as guardian, in the matter of making investments on account of the ward's estate.

*Fitz Simmons* v. *Fitz Simmons*, 1 *S. C.* 400. In this case the administrator was held liable for calling in a secured bond in depreciated currency at its nominal value, for the reason that no necessity of administration warranted such act. This impliedly concludes that if such necessity had, in fact, existed, or its existence could be reasonably presumed, authority so to do might have been inferred. If capable of being inferred in the case of a secured debt, it clearly would be so in the case of an unsecured debt.

*Creighton* v. *Pringle*, 3 *S. C.* 77. This was a case of changing investments that were optional and upon consultation, and, of course, no necessity can be presumed to have existed for calling in secured debts, constituting settled property for depreciated currency at its nominal value.

*Cureton* v. *Watson*, 3 *S. C.* 451. In this case a security was called in in depreciated currency at its nominal value, and the liability of the guardian was put upon the absence of necessity for so doing.

*Waller* v. *Creswell*, 4 *S. C.* 353. The point decided in this case was raised as a naked one, namely, whether a guardian could legally make a loan to the confederate government, and as it directly involved a question of the construction and effect of the constitution and laws of the United States, it was decided under

KOON *v.* MUNRO.

the authority of *Head* v. *Tally, U. S. S. C.* This case differs from all the other cases of the class in this court, as a federal question was directly interposed that was ruled by the Supreme Court of the United States.

*Chalk* v. *Patterson,* 5 *S. C.* 290, was a case of investment by a public officer acting under the direct orders of the court, and is not, therefore, an analogous one. That case, with *Pickens* v. *Dwight,* 4 *S. C.* 360, was placed on the ground that an officer of the court obeying the requirements of the act of the confederate congress, as it regards funding currency, must be regarded as yielding to superior force which he has no power to resist, and could not be held responsible therefor. The question presented was not one of investment, as the officer had no general authority to invest, and no special authority appears.

It will thus be seen that the cases in this court are in perfect harmony with the conclusions already stated, and even go so far as to give implied support to them. It remains to examine the bearing of these principles on the facts disclosed by the present case, as it regards the further question whether the administrator is to be regarded as having converted confederate currency rightfully in his hands as part of the assets of his intestate's estate into confederate bonds.

It appears that the administrator was indebted to the estate both individually and as a member of a co-partnership. Assuming that there was in his hands, as administrator, an amount of confederate currency at the time of funding, that currency must, according to the account submitted in evidence, represent an amount wholly or in part placed by the administrator among the assets on account of such indebtedness. Such a transaction is equivalent to a payment by the administrator on account of his indebtedness in confederate currency. Applying the principles heretofore stated to such facts, but with regard to the additional fact that the administrator in taking from himself depreciated currency at its nominal value was acting in his own interest, though not necessarily to the exclusion of the interest of the estate, and it is clear that he should be credited with so much only of the amount paid by him in currency on account of the indebtedness with which he was connected personally, as was

advantageously used for the benefit of the estate. An expenditure for the purchase of confederate bonds could only be sanctioned by necessity, and must be regarded, independently of such necessity, as disadvantageous to the estate, and of course the administrator would not be justified in paying his indebtedness to the estate in depreciated confederate currency at its nominal value for the purpose of converting such currency into confederate bonds. It would not necessarily result from this that the entire investment in confederate bonds should be disallowed independently of an examination of the accounts, to ascertain whether any portion of the currency that went into such bonds was derived from assets of the estate, other than that paid by the administrator himself, in discharge of his individual and joint debts. The decree of the Circuit Court advances a different principle from that here propounded as the basis of the account with which it is accompanied. It must be accordingly assumed that in stating such account, regard was not had to circumstances that might restrict the liability of the administrator upon the principles already stated. Although we might readily, on the basis of the returns set forth, arrive at a solution of the present question, yet to some extent that conclusion would rest on presumptions and inferences arising from those accounts.

As the statement of the accounts was not conformed to the principles that should have been applied to them, the attention of the parties not having been directed, as may be assumed, to such considerations, there should be a new inquiry directed and confined, as it regards the present question, to ascertaining how much, if any, of the amount funded in bonds consisted of confederate currency rightfully in the hands of the administrator as assets of the intestate not available for outlay to meet any other proper exigency of the estate, to the end that the administrator should receive credit for such amount upon the principles above stated. To the extent thus indicated the conclusions of the Circuit judge should be set aside.

What has already been said disposes of the questions raised by the appeal in the first, second, third, fourth, tenth and twelfth grounds of appeal.

The fifth ground of appeal is not well taken. Interest is

charged in the customary manner, commencing at the beginning of the year next succeeding the granting of administration. The argument of the appellant seems to treat the charge of interest as a penalty for not disbursing funds in due time; on the contrary, as the rule has been applied too long to admit of question, it is intended to enforce upon the administrator the duty of keeping the funds of the estate productive which are employed for the purposes of administration.

The first proposition embraced under the sixth point is that forfeiture of commissions for want of making due annual returns cannot be enforced as incidental to an accounting, but must be made the subject of a judgment directly establishing the forfeiture and imposing the penalty. The doctrine contended for is undoubtedly sound in its application to forfeitures affecting vested rights, but commissions are compensations for services rendered. The forfeiture imposed by the statute afforded only the right to commissions as compensation for mere work to be performed, which was an executory right and not anything in the nature of a vested right.

The other proposition under this sixth ground of appeal claims commissions on the amount found to be due by the final judgment in this action. Upon the final adjustment of the account in conformity herewith, the administrator will be entitled to such commissions upon the amounts ascertained to have been received and disbursed by him as shall not have been previously credited in the accounts, provided such commissions shall not have relation to years in which the administrator failed to make his returns.

As the footing of an account remains to be finally ascertained, the principles in question cannot be applied to ascertain at the present time the proper allowance for commissions.

Nor can we yet determine, as affecting the question of commissions, on the amount of any judgment that may be recovered by plaintiff, whether conforming to such judgment should be regarded in equity as a voluntary payment under judicial construction, or as purely *in invitum*. What has been said disposes of the points raised by the seventh ground of appeal.

It is urged that the omission to file returns during the dis-

arrangement of business occasioned by the war, was excusable. The requirement is a statute requirement, and conditions not expressed cannot be interpolated. Whether it is competent for a court of equity to allow to an administrator compensation, where he ought not to be chargeable with the failure to file his returns, is a question that cannot be considered, for want of sufficient ground laid for raising such question; the claim here is for commissions and must be pursued under statute.

It will become necessary to settle the interest account in harmony with the ultimate conclusion, whether the administrator is to be regarded as having actually paid in the amounts due from himself and from Keenan & Norris. If it is found that no such payment was made, then interest should be computed on the notes and no charge for interest made in the accounts as for cash received. If it is found that any part of that indebtedness is to be regarded as paid, the interest will, as to such part, run into the interest account, and as to the unpaid balance, be computed on the notes as indebtedness. The parties in interest had an undoubted right to hold the administrator to the statement of an actual payment, and also to rely on the principle of equity that deems the amount due from the administrator as paid. In taking the position that there was no actual or legal payment, they demand a re-adjustment of the account according to the actual facts and that entails a corresponding re-adjustment of the interest account.

The ninth ground relates to matters that can have no important bearing on the questions at issue. The eleventh ground cannot be supported; the facts on which it depends were seriously controverted by testimony conflicting with that of the administrator, and the conclusion of fact that he had failed to establish the fact that his action complained of was taken with the advice and consent of certain of the distributees, cannot be disturbed, for the reason that it depends almost wholly on a question of the credibility of the conflicting testimony.

The twelfth ground contains the proposition that because the debtor in a certain transaction (the confederate government) had said to its creditors that unless they performed certain acts, not called for by their contracts, those debts should be reduced to a

certain amount, such declaration should be judicially enforced. We do not think that this proposition demands argument to show that it has no foundation.

The objection that the judgment was not filed in sixty days after the adjournment of the court, is without force. The constitution imposes no penalty for the failure of judges to render their decisions in the required time, and the courts certainly would not visit the consequences of any wrong that might be committed by a judge on the innocent party entitled to a judgment, and who is the only party prejudiced by the delay, by taking from him a judgment admittedly just.

The judgment of the Circuit Court must be set aside, so far as inconsistent herewith, and in all other respects affirmed, and the case remanded for further proceedings in conformity herewith.

Decree modified.

McIVER and HASKELL, A. J.'s, concurred.